IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 7 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JERRY MALESOVAS, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| FLEET RETAIL FINANCE, INC., JP MORGAN | § | |
| CHASE & CO., BACK BAY | § | |
| CAPITAL FUNDING, LLC, each individually | § | |
| and as agents for various banks party | § | |
| to credit agreements described herein, | § | CIVIL ACTION **B-02-.037** |
| LEONARD GREEN & PARTNERS, L.P., | § | |
| GREEN EQUITY INVESTORS II, L.P., | § | |
| JOHN W. HECHINGER, JR., | § | |
| JOHN W. HECHINGER, S. ROSS HECHINGER, | § | |
| ANN D. JORDAN, ROBERT S. PARKER, | § | |
| MELVIN A. WILMORE, ALAN J. ZAKON, | § | |
| KENNETH J. CORT, W. CLARK | § | |
| McCLELLAND, JUNE R. HECHINGER, | § | |
| NANCY HECHINGER LOWE, SALLY | § | |
| HECHINGER RUDOY, CATHERINE S. | § | |
| ENGLAND, RICHARD ENGLAND, JR., | § | |
| JUNE L.P., LOIS ASSOCIATES L.P. and | § | |
| JARSAN   ASSOCIATES L.P., | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Jerry Malesovas, ("Malesovas") brings suit against the following

Defendants: John W. Hechinger, Jr., John W. Hechinger, S. Ross Hechinger, Ann D. Jordan, Robert

S. Parker, Melvin A. Wilmore, Alan J. Zakon, Kenneth J. Cort and W. dark McClelland (the

"Directors") formerly were directors (and in some cases officers) of Hechinger. Defendants John W.

Hechinger, Jr., John W. Hechinger, S. Ross Hechinger, June R. Hechinger. Nancy Hechinger Lowe,

Sally Hechinger Rudoy, Catherine S. England, Richard England, Jr., June L.P., Lois Associates L.P.

and Jarsan Associates L.P. each were members of — or were entities owned or controlled by — the Hechinger and England families (collectively, the "Hechinger Family Defendants"), FLEET RETAIL FINANCE, INC., JP MORGAN CHASE & CO., BACK BAY CAPITAL FUNDING, LLC, each individually and as agents for various banks party to credit agreements described herein, LEONARD GREEN & PARTNERS, L.P., and GREEN EQUITY INVESTORS II, L.P., ("Defendants") and as grounds for recovery would show the following:

## SUMMARY OF ACTION

1.      This is an action brought pursuant to Tex. Rev. Civ. Stat. Ann. art. 581-33A(1), (2) (Vernon Supp. 1998); Tex. Bus. & Com. Code Ann. §§ 7.01 (Vernon 1987) ("TSA") to recover for violations there under.

2.      The cause of action arise out of an integrated financial transaction that sealed the financial doom of investors such as Malesovas. The Directors and the Hechinger Family Defendants breached the TSA for their own selfish gain by engineering, facilitating, recommending and approving a misconceived leveraged buy-out (the "Hechinger LBO") of the long-ailing Hechinger's chain of home improvement stores owned by Hechinger Company and its affiliates ("Hechinger"); as a direct result of the Hechinger LBO, each of the Directors, the Hechinger Family Defendants and other shareholders received substantial payments for their own Hechinger stock and began to make statements that misstated the true value of the company.

3.      Defendants Fleet Retail Finance, Inc., JP Morgan Chase & Co., and Back Bay Capital Funding, LLC (the "Bank Defendants"), were part of, or successors in interest to, a group of lenders who financed the Hechinger LBO with callous disregard of its devastating consequences on unsecured creditors. As an integral part of this transaction, Hechinger acquired Builders Square (the "Builders

Square Acquisition" and, together with the Hechinger LBO, the "Transaction") — a competing chain of home improvement stores also in dire financial straits — and financed the transaction by incurring hundreds of millions of dollars of secured debt that the Debtors could not service under any foreseeable scenario. Once again, the Defendants' statements and actions misrepresented the true financial condition of the Company and were violations of the TSA.

4.      Hechinger had been controlled for decades by the Hechinger family, which was' eager to cash out its rapidly deteriorating investment to Defendant Leonard Green & Partners, L.P. together with its affiliate, Green Equity Investors II, L.P., ("Leonard Green"). The Hechinger Family Defendants, Leonard Green, and the Bank Defendants (or their predecessors) considered, negotiated, and ultimately consummated the Hechinger LBO and the Builders Square Acquisition in one integrated Transaction, even though Hechinger's financial advisor, Donaldson, Lufkin & Jenrette ("DLJ"), had already advised Hechinger's Board that Hechinger was insolvent. DLJ's opinion — including its findings with respect to Hechinger's insolvency - was published in a proxy statement filed with the Securities and Exchange Commission in the weeks before the Transaction closed. Knowingly or recklessly disregarding this opinion and the fact that Hechinger's was insolvent, Hechinger, the Directors, the Hechinger Family Defendants, Leonard Green, and the Bank Defendants proceeded with the Transaction notwithstanding its inevitable consequences: Chapter 11 bankruptcy, business failure, and, ultimately, liquidation.

5.      Through the Transaction, Defendants transferred or facilitated the transfer of enormous value from the Company to themselves for no consideration in return and misrepresenting the value to investors such as Malesovas. These transfers included payments to  former shareholders and Leonard Green, and fraudulent transfers and transaction fees to the Bank Defendants and other third

parties. By financing the transaction with borrowed money secured by the Company's own assets, the

Transaction shifted all of the risk of the Company's troubled operations to the Plaintiff. Accordingly,

to redress the harm caused to the Plaintiff, he seeks to recover his actual damages incurred as a result

of the misrepresentations.

## JURISDICTION AND VENUE

6.    Jurisdiction of this Court is proper pursuant to 28 U.S.C. §1332(a).

7.    Venue in this Court is proper.

8.    Plaintiff Jerry Malesovas is a resident of Dallas County, Texas.

9.    Defendant John W. Hechinger, Jr., who was the Chief Executive Officer and Chairman

of the Board of Directors of Hechinger at the time of the Transaction, approved the Transaction and

may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD  20785.

10.    Upon information and belief, Defendant S. Ross Hechinger, who was Senior Vice

President of Administration and a Director of certain of Hechinger at the time of the Transaction,

approved the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER,

MD  20785.

11.    S. Ross Hechinger was a member of the Hechinger family and directly and/or indirectly

owned and controlled a substantial amount of Hechinger stock prior to the Transaction and may be

served with citation at 3500 PENNSY DRIVE, LANDOVER, MD  20785.

12.    Upon information and belief, Defendant John W. Hechinger, who was a Director at the

time of the Transaction, approved the Transaction and may be served with citation at 3500 PENNSY

DRIVE, LANDOVER, MD  20785.

14.    Upon information and belief. Defendant Kenneth J. Cort, who was President, Chief

Operating Officer and Director at the time of the Transaction, approved the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

15. Upon information and belief, Defendant W. Clarke McClelland, who was Executive Vice President, Chief Financial Officer and Director at the time of the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

16. Upon information and belief, Defendant Ann D. Jordan, who was a Director at the time of the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

17. Upon information and belief, Defendant Robert S. Parker, who was a Director at the time of the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

18. Upon information and belief, Defendant Melvin A. Wilmore, who was a Director at the time of the Transaction, approved the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

19. Upon information and belief, Defendant Alan J. Zakon, who was a Director at the time of the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

20. Upon information and belief, Defendant June R. Hechinger is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction and may be served with citation at 3500 PENNSY DRIVE,: LANDOVER, MD 20785.

21. Upon information and belief, Defendant Nancy Hechinger Lowe is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

22. Upon information and belief, Defendant Sally Hechinger Rudoy is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction and may be

served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

23.   Upon information and belief, Defendant Catherine S. England is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

24.   Upon information and belief, Defendant Richard England, Jr. is a member of the Hechinger family and was a substantial shareholder of Hechinger prior to the Transaction and may be served with citation at 3500 PENNSY DRIVE, LANDOVER, MD 20785.

25.   Upon information and belief, Defendant June L.P. is a limited partnership organized and existing under the laws of the State of Maryland and having its principal place of business at 11150 Main Street, Suite 503, Fairfax, Virginia 22030. Upon information and belief, June, L.P. is a partnership consisting of members of the family of John W. Hechinger. John W. Hechinger, Jr., S. Ross Hechinger, Sally Hechinger Rudoy and Nancy Hechinger Lowe are the general partners of June L.P., and John W. Hechinger and June R. Hechinger are its limited partners. June, L.P. was a substantial shareholder of Hechinger prior to the Transaction.

26.   Upon information and belief, Defendant Lois Associates L.P. ("Lois"), is a limited partnership organized and existing under the laws of the State of Maryland and having its principal place of business at 11150 Main Street, Suite 503, Fairfax, Virginia 22030. Upon information and belief, Lois is partnership consisting of members of the family of Richard England. Catherine England, Richard England, Jr. and Joan England Akman are the general partners of Lois. Lois was a substantial shareholder of Hechinger prior to the Transaction.

27.   Upon information and belief, Defendant Jarsan Associates L.P. ("Jarsan") is a limited partnership organized and existing under the laws of the State of Maryland and having its principal place of business at 11150 Main Street, Suite 503, Fairfax, Virginia 22030. Upon information and belief, Jarsan is a partnership consisting of members of the family of John W. Hechinger. John W. Hechinger, S. Ross Hechinger, Sally Hechinger Rudoy, Nancy Hechinger Lowe were general partners

of Jarsan. Jarsan was a substantial shareholder of Hechinger prior to the Transaction.

28.   Upon information and belief Defendant JP Morgan Chase & Co., ("Chase") is a national banking association with an office located at 1 Chase Manhattan Plaza, New York, New York. Chase was among the lenders that financed the Transaction and served as Administrative Agent, Collateral Agent, Issuing Bank, and Swingline Lender under the Credit Agreement.

29.   Upon information and belief. Defendant Fleet Retail Finance, Inc. ("Fleet") is Incorporated in Delaware with an office located at 1013 Centre Road, Wilmington, Delaware. Fleet was among the lenders that succeeded to the rights of the lenders who financed the Transaction and served as Administrative Agent and Collateral Agent under the Amended Credit Agreement (as defined *infra*). Fleet was formerly known as BankBoston Retail Finance, Inc.

30.   Upon information and belief, Defendant Back Bay Capital Funding, LLC is a limited liability company organized and existing under the laws of the State of Delaware with an office located at 440 South LaSalle Street, Chicago, Illinois. Back Bay Capital Funding LLC was among the lenders that succeeded to the rights of the lenders who financed the Transaction and served as Administrative Agent under the Amended Credit Agreement.

31.   Upon information and belief. Defendant Leonard Green & Partners, L.P. (" LGP") is a limited partnership organized and existing under the laws of the State of California and having its principal place of business at 333 South Grand Avenue, Suite 5400, Los Angeles, California.

32.   Upon information and belief. Defendant Green Equity Investors II, L.P. (" GEI II") is a limited partnership organized and existing under the laws of the State of California and having its principal place of business at 333 South Grand Avenue, Suite 5400. Los Angeles, California. Upon information and belief, GEI II is under common ownership and control with LGP.

### FACTS IN SUPPORT OF CLAIMS FOR RELIEF HECHINGER'S RAPIDLY DETERIORATING FINANCIAL CONDITION LEADS THE HECHINGER FAMILY TO CASH OUT

### A.   <u>Hechinger: Background And Corporate Structure.</u>

33.  Hechinger, which owned and operated stores under the Hechinger's and Home Quarters trademarks, was a major retailer of products and services for home improvement, remodeling, and maintenance. Hechinger was the ultimate parent company of several corporations running these retail chains.

34.  Sidney Hechinger founded Hechinger in 1911. Hechinger became a public company in 1972, but members of the Hechinger family — including John W. Hechinger, Jr., John W. Hechinger, S. Ross Hechinger and other Hechinger Family Defendants - retained control over the company until the Hechinger LBO. Hechinger had two classes of stock, class A (31 million shares outstanding) and class B (11.2 million shares outstanding). Because the Hechinger Family Defendants owned most of the class B shares ~ which allowed them to cast ten votes for each share - the Hechinger Family Defendants controlled over 70% of the voting power of Hechinger even though the Hechinger Family Defendants did not own a majority of Hechinger's stock. No significant decision could be made without the Hechinger Family Defendants' approval.

B.  **Fraudulent Concealment of True Corporate Status**

35.  The Defendants conspired to keep the true status of the company from bond holders such as Malesovas by concealing the true nature of the company.  Hechinger embarked on a major expansion program in which it added eighty-four stores to its thirty-four store base to further hide its true economic state from investors.  Reality forced Hechinger to close sixteen of its Home Quarters stores and nine Hechinger's stores.  Not coincidentally, the decline in Hechinger's performance resulted primarily from Home Depot's initiative to expand into Hechinger's core markets beginning in 1993.

36.  Even more ominous was the fact that Hechinger's same store sales had decreased by increasing amounts.

37.  Hechmger already was a highly leveraged company prior to 1997. At that time, it had approximately $321 million outstanding on three public bond issues along with a revolving credit facility with CIT Group/Business Credit, Inc. ("CIT") of approximately $110 million (the "CIT Loan"). Hechinger's debt service coverage - earnings before interest, taxes, depreciation and amortization ("EBITDA") minus capital expenditures divided by interest - for the twelve months ended August 2, 1997 was only .9, which meant that its cash flow was insufficient to meet interest obligations. In fact,

for the same period, Hechinger's debt was 11.5 times EBITDA, which was significantly higher than its competitors. In an effort to profit off of a company in dire financial situation, the Defendants concocted a scheme to strip the company of any chance of survival. The Defendants' plan included exorbitant fees and a premium price for worthless stock. The scheme was furthered by reports of a revitalization of the company through the sale and merger with Builders Square. The Defendants fraudulently concealed the true effect of the transactions in 1997 even after the company was placed into bankruptcy. This concealment prevented investors such as Malesovas from discovering the true state of affairs of the company and caused him great financial injury.

38.    Upon information and belief, the Directors and certain of the Hechinger Family Defendants were notified of the flaws in the liquidation analysis. Notes from an August 27, 1997 Board meeting reflect a discussion indicating that Hechinger's "liquidation value is approximately] $0" and that in a chapter 11 scenario "equity in retail [businesses] typically gets little or nothing." Yet McClelland also noted a more serious impediment to the Hechinger LBO. He added in a memo to DLJ that "I have not assumed a dividend to shareholders out of the proceeds of asset sales since . . . [i]t also may be a 'fraudulent conveyance' if this were to be done prior to a liquidation." Upon information and belief, these notes were taken after Hechinger announced a substantial loss for the third quarter and Leonard Green's triggering of the "material adverse event" clause in its agreement with Hechinger. Thus, senior management, the Board of Directors (including the Directors) and the Hechinger Family Defendants were concerned that Hechinger would not survive as a going concern or that it would have to file for bankruptcy protection.

## C.    The Lenders' Funds Cash Out Hechinger's

39.    A bank group assembled by Chase Securities Inc. and led by Chase (the "Chase Bank Group") financed the Hechinger LBO and the Builders Square Acquisition. The Chase Bank Group originally included: BankAmerica Business Credit, Inc., as Documentation Agent and Borrowing Base Agent, Citicorp USA, Inc., as syndication agent, AT&T Commercial Finance Corporation, BankBoston, N.A., BNY Financial Corporation, BTM Capital Corp., CIT, Congress Financial Corporation (Western), Deutsche Financial Services, Dresdner Bank (New York and Grand Cayman Branches), Fleet Capital, Heller Financial Corp., IBJ Schroder Business Credit Corporation, LaSalle

Business Credit, Inc., Mellon Bank, N.A., National Bank of Canada, National City Commercial Finance, PNC Business Credit, Sanwa Business Credit Corp. ^Signet Bank, Transamerica Business Credit Corp., Van Kampen American Capital Prime Rate Income Trust, and Wells Fargo Bank, N.A. Upon information and belief, Dime Commercial Corporation, Fleet Business Credit, Foothill Capital Corp., and Jackson National Life Insurance Co. subsequently joined the Chase Bank Group.

40.   BSQ Acquisition acquired Hechinger (hereinafter the term "Hechinger" includes any companies that were affiliated with Hechinger after the Transaction) through a triangular merger. The Chase Bank Group loaned the face amount of $171 million to BSQT (the "BSQT Loan"), which amounted to $160,818,433 after the deduction of fees and expenses. The BSQT Loan was secured by all of BSQT's inventory, accounts receivable and equipment. BSQ Acquisition formed Hechinger Acquisition Inc. ("Hechinger Acquisition"), contributed a portion of the BSQT Loan to Hechinger Acquisition, and paid the remaining $100,652,827 to the Hechinger shareholders, including the Hechinger Family Defendants and the Directors, in exchange for their stock. Hechinger Company merged into Hechinger Acquisition "and became a wholly-owned subsidiary of BSQ Acquisition, a wholly-owned subsidiary of Centers Holdings. The net effect was the ultimate demise of bond holder value. Although the Defendants knew of the complete folly of this merger, the need to generate and receive fees at the expense of investors such as Malesovas won out. The Defendants perpetuated and concealed the fraud by continuing to mislead and misrepresent the true condition of the company.

41.   On September 25, 1997 the Chase Bank Group also loaned Hechinger Stores $112 million (the "CIT Repayment Loan") which was used in part to pay off CIT, Hechinger's former working capital lenders. The inventory owned by the Hechinger Company and BSQT was then transferred in a series of steps to the Hechinger Investment Company of Delaware (" HICD"). HICD became the "Permanent Borrower" under a $600 million secured loan (the "Chase Loan") made by the Chase Bank Group pursuant to a Credit Agreement, dated as of September 26, 1997 (the "Credit Agreement"). Centers Holdings, Inc., BSQ Acquisition, BSQT, Hechinger, HechingerStores, and Hechinger Stores East Coast Company also were parties to the Credit Agreement. Through a series of steps, $243 million of the Chase Loan was used to pay off the BSQT Loan ($127 million of which had been used to pay fees and to cash out the Hechinger shareholders) and the CIT Repayment Loan. Pursuant to a Security Agreement, dated as of September 26, 1997 (the "Security Agreement"), Hechinger pledged all of its

inventory, accounts receivable and equipment, among other things, as security for the Chase Loan, and the Chase Bank Group obtained guarantees from all of HICD's affiliates. The parties also executed a Pledge Agreement, dated as of September 26, 1997 (the "Pledge Agreement"), pursuant to which all Hechinger affiliates pledged, among other things, their equity interests in any subsidiary corporations or other entities.

### E.  The Transaction Causes Malesovas Harm

42.   Prior to the Transaction, the Debtors had less than $110 million in secured debt, Even with Hechinger's insolvency, unsecured creditors such as Malesovas had significant assets from which he could satisfy much of his claims.

43.   The Transaction immediately caused substantial harm to unsecured creditors because Hechinger effectively gave away over $127 million of value in Transaction fees and payments to the Hechinger Family Defendants, the Directors and Hechinger's other former shareholders and replaced this value with additional secured debt that was structurally senior to the Debtors' unsecured creditors. In fact, the Transaction caused secured debt - substantially all of which was held by the Chase Bank Group — to increase by approximately $200 million when the Transaction closed, and all signs indicated that such debt would continue to increase because of the rapidly deteriorating state of the businesses. The Directors knew or recklessly disregarded the deleterious effect of the Transaction on unsecured creditors. Indeed, the Proxy Statement relating to the Transaction stated that the Directors "considered that the additional leverage which would be incurred in connection with the Merger could affect the creditworthiness of Hechinger after the consummation of the Merger and, accordingly, cause the Company's outstanding indebtedness to trade at a greater discount than prior to the announcement of the Original Merger Agreement.

44.   The Transaction also had disastrous long-term effects on Malesovas's investment. Upon information and belief, from the Transaction to the present, secured debt increased by approximately $485 million. Unfortunately, as Hechinger's secured debt increased, the assets available to satisfy the claims of unsecured creditors not only decreased by the amount of the secured debt, but also by the amount that Hechinger's asset base deteriorated: nearly $400 million. Thus, the total assets potentially available for distribution to unsecured creditors (at book value) decreased by as much as $885 million

from the date of the Transaction to the present.

45. Hechinger and Builders Square were deteriorating rapidly before the Hechinger LBO and the Builders Square Acquisition. After the merger, they became even weaker. The company paid various fees and financing charges totaling $27,943,823, $2 million more than the equity capital contributed to the Transaction by Leonard Green through GEI II. Secured debt increased by at least the $127 million debt, which the Directors used to pay fees and to dividend to themselves, the Hechinger Family Defendants and Hechinger's other former shareholders. The Transaction saddled the company with a debt to capital ratio (at the book value of assets) of 95.6% in the case of Centers Holdings (nearly three times the industry average) and 71.9% in the case of Hechinger. Upon information and belief, the Chase Bank Group bore none of the risk of the Transaction because they underwrote the loan on a liquidation basis. Instead, the Chase Loan transferred the risk to the Malesovas who was structurally subordinate to the Chase Bank Group in terms of claims on most of the company's property and who would receive little, if any, recovery in a liquidation.

47. Upon information and belief, the Chase Bank Group's reckless indifference to Hechinger's deteriorating financial condition was driven by its hope to consummate a very profitable transaction no matter what the ramifications. With a chance to make millions in up front fees and interest - and with a lien that covered its exposure - the downside risk was virtually zero. Indeed, it proved to be zero because the Fleet Bank Group - which acquired the Chase Loan — was paid in full with interest.

## D.    The Chapter 11 Filings.

48. On June 11, 1999, after recently closing thirty-four Builders Square stores, Hechinger and its affiliated companies filed for chapter 11 protection under the Bankruptcy Code in the District of Delaware. Upon information and belief, Hechinger was in the process of closing eighty-nine additional stores. Hechinger misrepresented its true intent by initially stating that it could restructure its operations and emerge from bankruptcy as a reorganized company. However, with Hechinger's weak management team, high leverage, and deteriorating sales, there was little question that it would soon liquidate. On or about September 9, 1999, Hechinger ceased its operations and publicly announced the liquidation of all of its remaining assets.

## E.   <u>Damages</u>

49.  As a result of the violations of the TSA, Malesovas has sustained damages of $450,000.00 inclusive of interest, attorney fees, and actual damages for which he seeks recovery from the Defendants.

WHEREFOR, PREMISES CONSIDERED, Malesovas prays that the Defendants be cited to appear, that this case be set for trial, and that Plaintiff have judgment against the Defendants in an amount of $450,000.00.

Respectfully submitted,

SCOTT YUNG L.L.P

John B. Scott
State Bar No. 17901500
350 North Saint Paul Street, Suite 2650
Dallas, Texas 75201
Telephone: (214) 220-9922
Facsimile: (214) 220-9933

ATTORNEYS FOR PLAINTIFF